In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1279

TIMOTHY MYERS,

*Plaintiff-Appellant*,

*v.*

ILLINOIS CENTRAL RAILROAD COMPANY,
d/b/a Canadian National/Illinois Central
Railroad Company,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 08 CV 02220—**Michael P. McCuskey**, *Chief Judge.*

ARGUED SEPTEMBER 15, 2010—DECIDED DECEMBER 15, 2010

Before MANION, SYKES, and HAMILTON, *Circuit Judges.*

MANION, *Circuit Judge.* For almost thirty years, Timothy Myers worked for the Illinois Central Railroad Company. The work was physically demanding and over the course of his career Myers suffered several injuries, including cumulative trauma disorders that eventually forced him to retire. He sued the Railroad claiming that

these disorders were caused by its negligence. Before trial, Myers offered reports from three medical doctors and an ergonomist that would prove the Railroad's negligence caused his injuries. But the district court barred Myers's experts and granted summary judgment for the Railroad. On appeal, Myers argues that the district court erred. Because the opinions of Myers's physicians were based on speculation, and the nature of his injuries necessitates expert testimony about specific causation that the ergonomist could not provide, we affirm.

I.

Myers is 50 years old, and he began working for the Railroad after graduating from high school in 1978. Over the years, he worked in various capacities, including as a brakeman, a switchman, and a conductor. Since the early 1990s, the job titles brakeman, switchman, and conductor included the same employment tasks, and we use them interchangeably. Regardless of the title, Myers's work was physically demanding. He would get on and off a slow-moving train 30 or 35 times a day and walk several miles every day on large, rocky ballast. Ballast is simply the rock that surrounds the train tracks. Sometimes the ballast was covered with bean meal or corn meal, which made it like walking through mud during the summer time and walking on ice in the winter. In addition to walking miles in those conditions, as many as 50 times a day Myers would throw the switch that changes tracks that a train is traveling on.

And he would connect the handbrakes and pull the pins that connect the train cars. These tasks varied in difficulty depending on the rail yard and the season.

Besides being physically demanding, this work was also dangerous. Myers fell off a tank car in 1981 and broke his right ankle and hurt his left knee, which required surgery. A few years later, he stepped on a large rock while he was getting off the train and injured his right knee. He had surgery on that knee too. Then in 1987, he injured his back after trying to move a four-hundred-pound draw bar, which is a device used for coupling a train car to the engine. As a result he missed three to five months of work. After that, Myers was injury-free until 1998 when he injured his knee and shoulder trying to force a cab door open. The knee improved with rest, but he had to have surgery on his shoulder.

Naturally these injuries and the nature of this work have taken a toll on Myers's body. Between 2004 and 2006, he began to experience pain in his left elbow, his right knee, and his back and neck. The problem with his left elbow was diagnosed as a medial epicondylitis, which is commonly called "golfer's elbow"; his right knee was diagnosed with osteoarthritis, which is commonly referred to as degenerative arthritis; and he had several serious problems with his back, including several herniated disks. Each problem required surgery—two, in the case of his back.

In 2008, he sued the Railroad under the Federal Employers' Liability Act, 45 U.S.C. § 51, claiming that the

Railroad's failure to provide him with a reasonably safe workplace caused the problems with his elbow, knee, and back and neck. The physicians who treated Myers for each of these injuries were listed as experts and expected to testify at trial. Myers also expected to call an ergonomist, Dr. Tyler Kress, who would testify at trial about how the dangerous conditions in the Railroad's yards could have caused Myers's injuries.

Before trial, however, the district court struck the four experts. It found that under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), none of the experts' opinions was based on reliable procedures or methods. It reasoned that the experts did not have an adequate understanding of Myers's medical history or his work with the Railroad to give an opinion about what caused his injuries. Concerning the ergonomist, the court found that because his analysis of railroad conditions was not focused on Myers's work there, his opinion was not reliable. After striking the experts, the district court granted the Railroad's motion for summary judgment, and this appeal followed.

## II.

There are two issues here. The first is whether the district court erred by finding that Myers needed expert testimony to establish specific causation and granting summary judgment for the Railroad. The second is whether the district court correctly applied *Daubert* when it struck Myers's physicians from giving expert testimony. We review de novo the granting of summary

judgment. *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010). And we review for an abuse of discretion the district court's decision to exclude the expert testimony. *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824-25 (7th Cir. 2010).

## III.

The primary question on appeal is whether Myers needs expert testimony to establish that the Railroad's negligence specifically caused the cumulative trauma injuries to his knee, elbow, and back and neck. In the district court and here, Myers argues that he merely needs to have expert testimony establishing that the conditions at the Railroad can cause the injuries that Myers suffers from. In support of this, Myers planned to call an ergonomist, Dr. Tyler Kress, to testify that the Railroad's practices can cause the same ailments afflicting Myers.

The district court struck the ergonomist because he could not tie Myers's work and the Railroad's practices to Myers's specific injuries. Myers argues that although Kress could not testify about what specifically caused his injuries, he could testify generally about the dangers that come with working in the Railroad's yards. And from that alone, the jury could find that Myers's injuries were caused by the Railroad. Thus, the issue Myers presents on appeal is not whether the ergonomist should have been excluded because he could not testify about the specifics of how Myers's work caused

his injury, but whether Kress's general causation testimony is sufficient to survive summary judgment.

Debate continues over the issue of how plaintiffs must establish causation under FELA. *See Norfolk Southern Ry. Co. v. Sorrell*, 549 U.S. 158, 173-175 & fn* (2007) (Souter, J., concurring) (surveying cases); *id.* at 178-181 (Ginsburg, J., concurring) (same); *see also McBride v. CSX Transp., Inc.*, 598 F.3d 388 (7th Cir. 2010) (Ripple, J.), *cert. granted*, 79 U.S.L.W. 3562 (U.S. Nov. 29, 2010) (No. 10-235). It is an important issue and one that has come to the forefront with the changing nature of the injuries that railroad workers suffer. *CSX Transp., Inc. v. Miller*, 858 A.2d 1025 (Md. App. Ct. 2004) (surveying FELA's development and application to a cumulative trauma injuries); *Aparicio v. Norfolk & Western Ry. Co.*, 84 F.3d 803, 811 (6th Cir. 1996), *abrogated on other grounds by Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *see also* Melissa Sandoval Greenidge, *Getting the Train on the Right Track: A Modern Proposal for Changes to the Federal Employers' Liability Act*, 41 McGeorge L. Rev. 407 (2010). The Act was passed at a time when every year thousands of railroad workers were killed and tens of thousands were maimed, and it "was designed to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations." *Wilkerson v. McCarthy*, 336 U.S. 53, 68 (1949) (Douglas, J., concurring). Although workers still get injured, the loss of lives and limbs is fortunately and increasingly rare. The injuries commonly reported now are cumulative trauma injuries or disorders; they "are characterized as 'wear and tear' on the tissue surrounding joints, ligaments,

and tendons." *Gutierrez v. Excel Corp.*, 106 F.3d 683, 686 (5th Cir. 1997). These cover everything from Myers's ailments to carpal tunnel syndrome and hearing loss. And "while CTDs are generally not caused by any one specific traumatic event, there are certain risk factors associated with cumulative trauma, including repetition, force, vibration, cold, and posture." *Id.*; *see also* Greenidge, *supra* at 408 & 419-21.

These injuries are still very serious and possibly compensable under the Act. But "the Act did not make the employer an insurer. The liability which it imposed was the liability for negligence." *Wilkerson*, 336 U.S. at 68 (Douglas, J., concurring). That, of course, means an employee must prove that the railroad was negligent and that the railroad's negligence caused the injury at issue. *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 503 (9th Cir. 1994). And nothing in the Act alters the accepted fact that unless the connection between the negligence and the injury is a kind that would be obvious to laymen, expert testimony is required. *Brooks v. Union Pacific R. Co.*, 620 F.3d 896, 900 (8th Cir. 2010).

While the plaintiff is obligated to prove some degree of negligence, the question remains whether expert testimony is required in that process. Expert testimony is unnecessary in cases where a layperson can understand what caused the injury. *See Wallace v. McGlothan*, 606 F.3d 410, 420 (7th Cir. 2010). So, for example, when a plaintiff suffers from a broken leg or a gash when hit by a vehicle, he doesn't need to produce expert testimony. *See Moody v. Maine Cent. R.R. Co.*, 823 F.2d 693, 695 (1st

Cir. 1987). But when there is no obvious origin to an injury and it has "multiple potential etiologies, expert testimony is necessary to establish causation." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46-47 (2d Cir. 2004); *accord Claar*, 29 F.3d at 504 (noting "expert testimony is necessary to establish even that small quantum of causation required by FELA").

Here, neither Myers nor his physicians could point to a specific injury or moment that brought on the problems with his knee, elbow, and back and neck. Instead, Myers claims that they are the product of years of working for the Railroad. That type of gradual deterioration is precisely what defines cumulative trauma injuries: "Cumulative trauma disorder refers not to one specific injury, but to numerous disorders caused by the performance of repetitive work over a long period of time." *Gutierrez*, 106 F.3d at 685-86. They are simply "wear and tear" on the body, and they can be the product of many factors. *Id.*

When an injury is of this nature, determining what caused it is not usually obvious to a layman and thus requires expert testimony. For most cumulative trauma injuries, courts follow the general principle that a layman could not discern the specific cause and thus they have required expert testimony about causation. *Brooks*, 620 F.3d 896, 899-900 (expert needed for degenerative disk disease); *Granfield v. CSX Transp., Inc.*, 597 F.3d 474, 484-487 (1st Cir. 2010) (expert needed for epicondylitis); *Moody*, 823 F.2d at 696 (expert testimony needed for emotional trauma); *see also* Greenidge, *supra*

at 423-26 (discussing cases); *but see Hardyman v. Norfolk & Western Railway, Co.*, 243 F.3d 255 (6th Cir. 2001) (in dicta noting that general causation testimony is enough to send the case to a jury for carpal tunnel syndrome). Of course, the label cumulative trauma injuries is broad, and in the case of hearing loss from the railroad failing to provide a worker with ear protection, the Second Circuit has held that no expert testimony was necessary: "there is a generally understood causal connection between physical phenomena—in this case, very loud sounds, which we refer to colloquially as 'deafening'—and the alleged injury [hearing loss] that 'would be obvious to laymen.'" *Tufariello v. Long Island R. Co.*, 458 F.3d 80, 88 (2d Cir. 2006). But that case is the exception and not the norm for whether expert testimony establishing specific causation is necessary for cumulative trauma disorders.

Here, the origin of Myers's various injuries would not be obvious to a layman. They can be caused by a myriad of factors, none of which is obvious or certain. *Gutierrez*, 106 F.3d at 686. Thus, to tie them to his working conditions at the Railroad, Myers needs expert testimony.

To be clear, the ergonomist could testify as an expert about how dangerous the railroad yard's conditions were, but that does not mean he is qualified to testify about what caused Myers's injuries. This is a scenario similar to what many plaintiffs face in toxic tort cases: an expert can testify that a chemical can cause the plaintiff's malady but he may not be qualified to testify that *this* chemical caused *this* particular plaintiff's malady.

*Claar*, 29 F.3d at 504; *see Golden v. CH2M Hill Hanford Group, Inc.*, 528 F.3d 681, 683 (9th Cir. 2008). "The question we must ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Gayton*, 593 F.3d at 617. Here, the specific question is whether Myers's work for the Railroad caused his ailments. Because the ergonomist could not answer that question, to avoid summary judgment Myers would have to establish evidence of specific causation from another source.

Myers planned to establish that the Railroad's negligence caused his injuries from testimony of his three treating physicians. Before trial, the Railroad moved to strike the experts' testimony as unreliable under *Daubert*. Under Federal Rule of Evidence 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). In this case, the district court's analysis focused on the physicians' methodology, and it concluded that the physicians' lack of knowledge of Myers's medical history and duties with the Railroad rendered their opinions unreliable under *Daubert*. On appeal, Myers argues that the physicians used a "differential diagnosis" to establish what caused his ailments, and rather than striking the experts, any ignorance of his medical

history or work duties should have been explored on cross-examination.

Differential diagnosis is an accepted and valid methodology for an expert to render an opinion about the identity of a specific ailment. *Happel*, 602 F.3d at 826. When a physician makes a differential diagnosis, he systematically compares and contrasts clinical findings from a patient's medical history to determine "which of two or more diseases with similar symptoms is the one from which the patient is suffering." *Id.* at 826, n.7 (quotation omitted). The question here, however, is not what Myers was suffering from but what caused his ailments, and a better term to describe it is a "differential etiology." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 673-74 (6th Cir. 2010). Etiology is the study of causation. V *The Oxford English Dictionary* 427 (2d ed. 1989). And in a differential etiology, the doctor rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment. There is nothing controversial about that methodology. *Tamraz*, 620 F.3d at 673-74. The question of whether it is reliable under *Daubert* is made on a case-by-case basis, focused on which potential causes should be "ruled in" and which should be "ruled out." *Ervin*, 492 F.3d at 904.

Other than Myers's assertion that the physicians did a differential etiology, there is nothing in the record that suggests they did, or if it was done that it could be considered reliable, because they did not rule in any causes

of Myers's ailment, nor did they rule out anything. They simply opined that it was the Railroad's working conditions that caused Myers's ailment. Given the nature of Myers's injury and his work, it seems natural to offer such an opinion. But the law demands more than a casual diagnosis that a doctor may offer a friend or acquaintance outside the office about what could be causing his aches and pains.

The physicians' deposition testimonies made it clear that they were clearly offering something less than a causation opinion that could qualify under *Daubert*. On this point, the physician who operated on Myers's back did not know about Myers's earlier back injury until after he rendered his opinion. When asked about what role Myers's 1987 back injury would play in his current condition, the physician responded:

> Well, I don't really think that it makes a hell of a lot of difference one way or the other. You put your interest in what he has got wrong with him on the day you treat him. *Now, if you are interested in causation, then from your standpoint, it's important.*

Another physician was also candid when questioned about the fact that he had not explored what Myers did at work and how that affected his causation opinion:

> [R]eally the thrust of my business is to find out what his problems are and what we think can be done about them. *So, again, I'm seeing him as a medical doctor, not as a—you know, seeing him for a work history type charge. So, you know, my charge—I would have spent*

*more time on that. Since that was not my charge, it was*
*really just to get a rough idea of what things he did.*

The physicians' testimonies made it clear that they were
offering a general medical opinion about his condition
at the time of treatment and an assumption that it devel-
oped over time at the Railroad. Other than common
sense, there was no methodology to their etiology.

   If a differential etiology was used and the experts were
unaware of aspects of his work or medical history, that
doesn't necessarily mean the expert should be struck.
On this point, we have instructed that when a med-
ical expert has "relied upon a patient's self-reported
history and that history is found to be inaccurate, district
courts usually should allow those inaccuracies in that
history to be explored through cross-examination." *Walker
v. Soo Line R.R. Co.*, 208 F.3d 581, 586-87 (7th Cir. 2000).
But here it's clear that the physicians did not use a dif-
ferential etiology; they knew little to nothing about
Myers's medical history or his work. They did not "rule
in" any potential causes or "rule out" any potential
causes. They simply treated Myers and assumed his
injuries stemmed from his work. In other words, the
basis for their opinions is properly characterized as a
hunch or an informed guess. And "the courtroom is not
the place for scientific guesswork, even of the inspired
sort." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th
Cir. 1996). Thus, the district court did not abuse its dis-
cretion by excluding the testimony of Myers's physi-
cians. And because Myers needed expert testimony to
establish causation and offered none, the district court

did not err in granting summary judgment for the Railroad. *Doty v. Illinois Cent. R.R. Co.*, 162 F.3d 460, 463 (7th Cir. 1998).

## IV.

Therefore, the nature of the trauma injuries that Myers accumulated required expert testimony establishing specific causation. The district court did not abuse its discretion by excluding the testimony of Myers's physicians, and because that was the only evidence offered for specific causation, the district court did not err in granting summary judgment for the Railroad. Accordingly, the judgment of the district court is AFFIRMED.