In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1194

RAYMOND B. BIELSKIS,

*Plaintiff-Appellant,*

*v.*

LOUISVILLE LADDER, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cv-01411—**Harry D. Leinenweber**, *Judge.*

ARGUED SEPTEMBER 16, 2010—DECIDED NOVEMBER 18, 2011

Before CUDAHY, ROVNER, and EVANS*, *Circuit Judges.*

ROVNER, *Circuit Judge.* After falling from a three-foot
high mini-scaffold and injuring his hand and knee, Ray-
mond B. Bielskis brought this product liability action
against Louisville Ladder, Incorporated, the manufacturer

* Circuit Judge Evans died on August 10, 2011, and did not
participate in the decision of this case, which is being resolved
by a quorum of the panel under 28 U.S.C. § 46(d).

of the scaffold. The district court granted Louisville Ladder's motion to bar the trial testimony of Bielskis's expert witness, Neil J. Mizen. Subsequently, the district court granted Louisville Ladder's motion for summary judgment after concluding that Bielskis could not prove his case without expert testimony. Bielskis appeals, arguing primarily that the district court erred when it barred Mizen from testifying. We affirm.

## I.

In 1997, Bielskis was working as an acoustical ceiling carpenter for R.G. Construction. R.G. Construction gave Bielskis the Louisville Ladder mini-scaffold (model number SM 1404) completely assembled, and he used it "occasionally" in his work duties. Then in 2001, Bielskis began working for International Decorators. Because International Decorators ordinarily supplied its workers with scaffolding, Bielskis rarely used his Louisville Ladder mini-scaffold. Indeed, between 2001 and 2005, Bielskis used the mini-scaffold on only one or two occasions to haul tools from his car to a job site.

On March 17, 2005, Bielskis was working acoustical ceiling tiles at a Motorola job site in Libertyville, Illinois. He had been working at that site for approximately two weeks and was slated to finish the job that day. For that reason, he had brought his own mini-scaffold so that he could use it to haul his tools back to his car when he completed the work at Motorola. Bielskis worked for several hours that morning on one of the scaffolds supplied by International Decorators, but around 9 a.m. a coworker borrowed the scaffold. At that point, Bielskis

retrieved his own mini-scaffold from his car. Before working on it, Bielskis visually inspected the mini-scaffold to ensure that the rungs and the wheels were secure and properly positioned.

The mini-scaffold is approximately four feet long with a hinged side that allows it to collapse for storage. The sides of the scaffold have rungs which are used to place planks where the user may stand. The entire unit is mobile: it has four wheels that may be locked while the user is working and unlocked when moving the unit. Each wheel is attached to the scaffold with a caster and metal stem that screws into the scaffold leg, as shown in the figure below:



Figure 1

Bielskis worked on the scaffold for several hours before the accident. Immediately before the scaffold collapsed, Bielskis had wheeled it into an office to install another ceiling tile and sprinkler-head cover. Once Bielskis had situated the mini-scaffold, he stepped onto the first plank (which was placed on the second rung) with one foot and placed his other foot on the second plank (placed on the third rung). As he began screwing the sprinkler head into place, the scaffold collapsed and he fell to the floor. When he attempted to pick up the scaffold, he realized that it had collapsed because the caster stem above one of the wheels had broken (see Figures 2 and 3 below).

 

Figure 2                              Figure 3

Relying on the diversity statute, 28 U.S.C. § 1332(a), (Bielskis is a citizen of Illinois and Louisville Ladder is a Delaware corporation with its principal place of

business in Louisville, Kentucky), Bielskis brought this products liability action against Louisville Ladder, Incorporated. Bielskis's complaint contained four counts based on strict liability: design defect, manufacturing defect, failure to warn, and res ipsa loquiter. Bielskis also alleged that Louisville Ladder had been negligent in failing to properly test the threaded stud of the caster stem, failing to inspect the scaffold, failing to "repair the defective threaded stud," and failing to warn consumers of a manufacturing defect in the scaffold. Louisville Ladder in turn filed a third-party complaint against Bielskis's employer at the time of the accident, International Decorators, seeking contribution to the extent of any of its workers' compensation liability. *See* 740 ILCS 100/1-5 (Illinois Joint Tortfeasor Contribution Act).

Bielskis retained Mizen to provide expert testimony at trial as to what caused the caster stem to break. Mizen obtained bachelor's and master's degrees in Mechanical Engineering in 1960 and 1961, respectively. Since that time he has held a number of engineering jobs, including working as a research engineer in the vehicle dynamics department of Cornell laboratory, where he developed packaging machinery and "numerically controlled manufacturing processes." In 1971, Mizen founded Mizen Engineering Company, Inc., where he worked to design and build equipment and computer-based control systems for use in a variety of manufacturing processes—from a machine that assembles small parts to one that cleans parts used in compressors. Since 1970, Mizen has also testified as an expert in a wide range of cases

covering areas such as manufacturing and design flaws, warnings, and use of equipment and tools.

In his written report, Mizen first described the "fractured roller caster." He explained that the rolling caster allowed the scaffold to move in any direction, and that it was held to the scaffold by a "3/8 inch diameter threaded stud secured to the top flange of the caster." This caster was in turn welded onto the bottom of the scaffold leg. Mizen went on to describe the types of stress that could have caused the stud to fail: he opined that the flange and shoulder would have borne all "compressive loads" and thus only "tensile stress" generated from tightening the caster when it was installed into the leg could have been responsible. Tensile stress refers to stress that leads to expansion (usually in length) while the volume stays constant. It is the opposite of compressive stress, which occurs when the material is under compression and the volume decreases. During his deposition, Mizen defined tensile strength as "[t]he ability of an object to resist tensile forces."

Based on his examination of the fracture surface on the threaded stud, Mizen then concluded that the stud failed because of a "brittle fracture." He based his opinion on the fact that the fracture surface had neither the "dull and fibrous" appearance nor the plastic deformation consistent with a "ductile fracture"—a fracture where the material pulls apart instead of snapping or cracking suddenly. Instead, the fracture surface revealed a clean break consistent with a brittle fracture. Mizen opined that the fracture was caused by excess tensile

stress brought on by overtightening the threaded stem. Mizen concluded that the brittle fracture could have been avoided by either attaching the wheel with a different mechanism than the threaded stud or by not tightening the stud "beyond making it simply snug to the leg base."

Louisville Ladder also retained an expert. Louisville Ladder's expert viewed the fracture surface through a stereomicroscope. The expert also conducted extensive testing and reconstructed the accident. Like Mizen, he concluded that the caster stem had sustained a brittle fracture. Unlike Mizen, however, he determined that the caster stem ultimately failed because it was too loose, not because it was too tight.

Louisville Ladder moved to bar Mizen's testimony, arguing that it was insufficiently reliable under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702. In particular, Louisville Ladder faulted Mizen for his failure to utilize any recognized scientific methodology to reach his conclusions. Moreover, Louisville Ladder argued, Mizen had neither tested nor examined the design alternatives that he had proposed.

The district court granted Louisville Ladder's motion. The court concluded that the methodology underlying Mizen's opinion was insufficiently reliable. The primary problem the court identified with Mizen's opinion was his leap, without data or testing, from the accepted premise that a crack without plastic deformation is a brittle fracture to his ultimate conclusion that the caster

stem here broke because it was overtightened. Essentially, the court believed Mizen's opinion fell short on each of the *Daubert* factors and was thus inadmissible.

Bielskis moved to reopen discovery in order to obtain another liability expert, but the court denied his motion. Louisville Ladder then moved for summary judgment. The court granted its motion, concluding that without expert testimony, Bielskis lacked evidence to support his product liability claim. Bielskis appeals.

## II.

Before turning to the merits of Bielskis's arguments on appeal, we must briefly resolve a jurisdictional matter. The district court granted Louisville Ladder's motion for summary judgment on December 30, 2009. Bielskis filed his notice of appeal on January 25, 2010. The following day, January 26, the district court entered judgment under Rule 58. *See* Fed. R. Civ. P. 58. Thus, we treat Bielskis's notice of appeal as having been filed on the day the court entered its Rule 58 judgment. Fed. R. App. P. 4(a)(2); *see also FirsTier Mortg. Co. v. Investors Mortg. Ins. Co.*, 498 U.S. 269, 272-73 (1991). The Rule 58 judgment itself, however, raises a second, more complicated jurisdictional issue: neither the district court's summary judgment order nor its Rule 58 judgment mentions Louisville Ladder's outstanding third-party complaint against Bielskis's employer, International Decorators. Ordinarily, "any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or

parties . . . ." Fed. R. Civ. P. 54(b). When there are claims or parties remaining, Rule 54(b) authorizes the district court to "direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Rule 54(b) applies whenever an action "presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim— or when multiple parties are involved[.]" *Id.*

Although the existence of the third-party claim against International Decorators brings this action within the technical language of Rule 54(b), we think as a practical matter that the court's entry of a Rule 58 judgment obviates the need for a Rule 54(b) certification. According to Rule 54(b), without the certification, "any order or other decision, however designated, *that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties* does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." (emphasis added). Although the district court failed to explicitly resolve Louisville Ladder's third-party claim against International Decorators, by entering summary judgment in Louisville Ladder's favor, the court necessarily adjudicated the claim against International Decorators. The entry of judgment under Rule 58 therefore appropriately concluded the litigation in the district court. *See* 28 U.S.C. § 1291 (giving courts of appeals jurisdiction over "all final decisions of the district courts"); *cf. Local P-171 Amalgamated Meat Cutters & Butcher Workmen v. Thompson Farms*

*Co.*, 642 F.2d 1065, 1072 (7th Cir. 1981) ("The formal prerequisites of Rule 58 for an effective judgment serve the same signalling function as the Rule 54(b) requirement of direction for entry of judgment; the same pragmatic analysis should therefore apply when that requirement is not met.").

Turning to the merits, Bielskis argues that the district court erred by excluding Mizen's testimony. The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles outlined in *Daubert*; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999) (extending application of *Daubert* factors to engineers and other non-scientific experts). It is the district court's role to ensure that expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589. To do so, the district court must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (outlining "three-step analysis" district court utilizes before admitting expert testimony). *Daubert* sets forth the following non-exhaustive factors for the district court to consider when assessing an expert's methodology: (1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community. *Daubert*, 509 U.S. at 593-94. The Rule 702 inquiry is "a flexible one," *id.* at 594, and we give

the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable, *see Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). We review the district court's decision to exclude expert testimony for an abuse of discretion. *Myers*, 629 F.3d at 641; *United States v. Lupton*, 620 F.3d 790, 798-99 (7th Cir. 2010).

After concluding that Mizen's education and experience rendered him qualified to testify, the district court focused on Mizen's methodology, which it concluded fell short across the board under the *Daubert* factors. The court concluded that Mizen's opinion was not reliable in light of his leap from the accepted premise that a crack without plastic deformation is a brittle fracture to his ultimate conclusion that the caster stem broke because it had been screwed in too tightly. When questioned as to what scientific methodology he used to reach this conclusion, Mizen replied that he had relied on "basic engineering intelligence" and "solid engineering principles that any other engineer would use."

After Louisville Ladder moved to exclude his testimony, Mizen supplemented his opinion with several articles that he claimed supported his conclusion. At his deposition, he explained that he located the articles by using the Internet search engine Google and typing in the phrase "brittle fracture." We think the district court was within its discretion to conclude that Mizen's methodology sounded more like the sort of "[t]alking off the cuff"—without data or analysis—that we have repeatedly

characterized as insufficient. *See, e.g., Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

Application of the *Daubert* factors demonstrates how Mizen's opinion falls short. An expert's opinion must be reasoned and founded on data. It must also utilize the methods of the relevant discipline—in this case, engineering. Bielskis insists that Mizen's opinion is sufficiently reliable because the question of how the caster stem broke is not a complicated one, and the jury should be allowed to decide for itself the factual issue of what caused the brittle fracture to occur. It is true that the district court's admissibility determination is not intended to supplant the adversarial process. We have recognized that "shaky" expert testimony may be admissible, subject to attack on cross-examination. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (internal quotations omitted). Although it is a close question, the district court was within its discretion to conclude that Mizen's testimony was unreliable, not simply shaky.

First, Mizen made no attempt to test his hypothesis. Bielskis suggests that this inquiry is unnecessary because Mizen needed nothing more than his engineering background and experience to conclude that the caster stem collapsed on account of a brittle fracture brought on by overtightening. But that theory is certainly capable of being tested. Mizen reached his conclusion by examining the broken scaffold for approximately an hour with his naked eye. He did not take the time to measure the caster stem: indeed, he assumed in his report that

the caster stem was 3/8″ and only later discovered that it was in fact ½.″ He admitted in his deposition that he had no idea what alloy was used to construct the caster stem and that he had made no effort to quantify its tensile strength or yield strength.

Bielskis seems to be suggesting that no engineer would have undertaken testing, but a comparison with the report of Louisville Ladder's expert opinion belies that claim. For example, Louisville Ladder's expert, Engineering Systems Inc. ("ESI"), first used digital calipers to measure the height between the HEX mating surface, the caster insert mating surface, and the corresponding fracture surfaces. Positive and negative replicas were also created of the fracture surfaces so that the fractographic appearance of the surfaces could be examined in detail. ESI then performed stress analysis calculations with the caster installed in two different configurations in order to assess the stresses present at the stud site with different degrees of tightness. Although the methodology used by ESI is certainly not the only way testing could have been performed, it exhibits that testing was not only possible but helpful.

Mizen maintained that his theory—that a fracture without plastic deformation is a brittle fracture—is widely accepted in the engineering community. Bielskis argues on appeal that the fact that Louisville Ladder's experts also concluded that the caster stem failed as a result of a brittle fracture further demonstrates that Mizen's methodology was reliable. But as the district court recognized, it was Mizen's further assertion that

the caster stem failed from excessive stress as a result of overtightening that was unreliable. Mizen submitted nothing with his opinion demonstrating that there would be any consensus in the engineering community for such a conclusion. Nor is it possible to assess the known or potential rate of error behind Mizen's methodology because he used no particular methodology to reach his conclusions. And of course Mizen's "methodology" of looking at the failed caster stem with his naked eye could not be subjected to peer review.

Likewise, Mizen's proposed design alternatives do not survive scrutiny. His original expert report simply contained the unelaborated conclusion that "[m]eans other than the threaded stud could have been used to hold the roller to the conveyor." Then at his deposition he suggested that instead of a threaded stud, the scaffold could have been supported by a "set screw, a spring, [or] a snap ring." When asked if those design alternatives had been tested, Mizen stated, "I don't have to test it." Likewise, he dismissed the question of whether any of his proposed design alternatives were used in the marketplace on scaffolds or had been recommended or required by any industry-wide standards for climbing equipment, stating, "It is the principles that [are] required, not the exact implementation." But "the principles" alone hardly constitute testimony based on "sufficient facts or data." Without more, there is no way to assure that Mizen's proposed alternatives are "the product of *reliable* principles and methods." Fed. R. Evid. 702 (emphasis added); *see also Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) ("In alternative design cases, we have

consistently recognized the importance of testing the alternative design.").

Bielskis asserts that by excluding Mizen's testimony, the district court usurped the jury's task of analyzing the "factual underpinnings" of the expert's conclusion and assessing whether that conclusion was correct. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). He relies for support on *Smith v. Ford Motor Company*, where we concluded that the district court had inappropriately excluded the testimony of two proposed experts. In *Smith*, the plaintiff sought to admit the testimony of a metallurgical engineer and a mechanical engineer to opine as to why the steering mechanism in a van failed. *Smith*, 215 F.3d at 716-17. The court first concluded that because neither expert was a qualified automotive engineer their testimony was inadmissible. *Id.* at 717. We determined that this was an abuse of discretion because the experts' lack of qualifications as automotive engineers did not necessarily preclude them from being qualified in other areas that may be relevant to the case—in short, their inability to opine on the ultimate issue for the trier of fact did not mean they could not testify regarding other relevant factual issues. *Id.* at 720.

The district court in *Smith* also deemed the experts' methodologies unreliable because they had not been peer-reviewed. *Id.* at 720. We likewise deemed this an abuse of discretion because the district court had erroneously focused on the single *Daubert* factor of whether the experts' techniques had been peer-reviewed. *Id.* at 721; *see also Daubert*, 509 U.S. at 594 (publication or lack

thereof in a peer-reviewed journal is "relevant, though not dispositive consideration"); *Dhillon*, 269 F.3d at 870 ("Of course, *Daubert* is a flexible test and no single factor, even testing, is dispositive.").

Bielskis makes much of our observation in *Smith* that when evaluating expert testimony the district court should avoid scrutinizing "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis." *Smith*, 215 F.3d at 718. But the district court here did not take issue with the factual underpinnings of Mizen's analysis or his ultimate conclusion that the caster stem sustained a brittle fracture because it was overtightened. Instead, the district court did precisely what we recognized as appropriate in *Smith* by determining whether it "'was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed.'" *Smith*, 215 F.3d at 718 (quoting *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000)). As discussed above, the district court concluded that Mizen's "sources of information"—which were nothing more than his own speculation—were insufficient. Unsurprisingly, the court was also unsatisfied with the "test . . . administered" because there *was no test administered.* Nor did the district court here overemphasize a single *Daubert* factor as the district court in *Smith* had done. In its ruling, the district court here specifically recognized that no one factor is dispositive, stating, "[Bielskis's] failure to establish the admissibility under any single *Daubert* factor is not dispositive, but Plaintiff's failure to establish admissibility under any of

the factors leaves the Court no choice but to bar Mizen's testimony." Thus, *Smith,* where the district court erroneously placed dispositive weight on the single factor of whether the theory had been subjected to peer review, does not help Bielskis.

We do think it is a close question whether Mizen should have been allowed to opine simply that the caster stem sustained a brittle fracture. This conclusion, without more, may be supportable based on Mizen's "extensive and specialized experience." *Kumho*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive specialized experience. Nor does anyone deny that, as a general matter, tire abuse may often be identified by qualified experts through visual or tactile inspection of the tire."). But this conclusion would add little if anything to Bielskis's case, particularly since the parties agreed that the caster stem sustained a brittle fracture. Thus, that portion of Mizen's opinion would not have assisted the jury with a fact in issue. Given the entirety of Mizen's testimony and its lack of the recognized hallmarks of scientific reliability, the district court did not abuse its considerable discretion by barring Mizen's testimony in its entirety.

Nor did the district court abuse its discretion when it denied Bielskis's motion for a continuance to obtain another expert. To support his argument, Bielskis again relies on *Smith.* Because we remanded in *Smith*, we explicitly declined to reach the issue of whether the district court had abused its discretion by denying a continuance.

*Smith*, 215 F.3d at 722. We noted however, and Bielskis relies heavily on this observation, that "courts have generally found an abuse of discretion" when "a trial court's own action causes a need for a continuance and that court then denies the continuance, resulting in prejudice to a party." *Id.* The two cases *Smith* cites in support of that proposition, however, are entirely distinguishable. In *Fowler v. Jones*, 899 F.2d 1088, 1095 (11th Cir. 1990), the court concluded that an *in forma pauperis* litigant should be entitled to rely on the United States Marshal to serve process, and thus the district court had abused its discretion by denying a continuance to allow the plaintiff to perfect service on three defendants, *id.* at 1095-96. In the second cited case, the Ninth Circuit concluded that a defendant corporation was denied a fair trial after the district court assured the corporation that it would accommodate the travel schedule of the corporation's expert but then concluded the trial before the expert could return from the scheduled trip and testify. *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 601-02 (9th Cir. 1983) ("[T]he district court's statement to counsel that it would work out the problem faced by the defendants because their expert would be unavailable until July 20 lulled Dependable and Ralphs into a false sense of security that the absent witness would be allowed to testify.").

Unlike in those cases, the district court here did not affirmatively "cause" the need for a continuance. The district court has broad latitude in determining when to grant a continuance. *E.g.*, *Morris v. Slappy*, 461 U.S. 1, 11 (1983); *United States v. Smith*, 562 F.3d 866, 871 (7th Cir.

2009) ("Whether to grant or deny a continuance is a matter of case management."). We will overturn its decision only when the judge has acted unreasonably and actual prejudice is shown. *Smith*, 562 F.3d at 871. Although the question is a close one, we do not believe the district court here abused its discretion. Discovery had closed when Bielskis requested a continuance to obtain a new expert. The district court was entitled as a principle of case management to refuse Bielskis's request for a second bite at the expert witness apple. *Id.* at 871 ("Having given Smith a fair opportunity to retain a suitable expert, the court was under no obligation to let him have *another* chance to present expert testimony . . . . 'If at first you don't succeed, try, try again' might make a memorable maxim, but it is ill-suited as a principle for case management.").

Finally, Bielskis argues that after barring his expert, the district court erroneously entered summary judgment in favor of Louisville Ladder. We review the district court's grant of summary judgment de novo, construing all facts and inferences in Bielskis's favor. *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 888 (7th Cir. 2011). Summary judgment is appropriate when the admissible evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986). The district court granted summary judgment after concluding that without expert testimony, Bielskis did not have sufficient evidence to sustain his product liability claim. Bielskis argues that

under Illinois law, he could have proven his case without expert testimony. In most cases, products liability actions alleging manufacturing or design defects require expert testimony. *See Baltus v. Weaver Div. of Kidde & Co.*, 557 N.E.2d 580, 588-89 (Ill. App. Ct. 1990) ("Products liability actions, however, often involve specialized knowledge or expertise outside the layman's knowledge. Manufacturing negligence resulting in an unreasonably dangerous product seems particularly appropriate for expert opinion."). However, as Bielskis points out, in certain cases expert testimony may not be necessary. He relies for support primarily on *Tweedy v. Wright Ford Sales, Inc.*, 357 N.E.2d 449 (Ill. 1976). In *Tweedy*, the Illinois Supreme Court affirmed a verdict against Ford Motor Company after the brakes on the plaintiff's 1966 Ford LTD failed when he attempted to stop at an intersection. *Id.* The plaintiff did not offer expert testimony specifying the cause of the brake failure; instead he attempted to prove that they were defective by relying on the simple fact that the brakes had failed without warning. *Id.* at 451. The Illinois court concluded that the plaintiff did not need expert testimony and could rely on the failed brakes to prove a defect. *Id.* at 451-52. The court explained that a plaintiff makes out a "prima facie case that a product was defective and that the defect existed when it left the manufacturer's control . . . by proof that in the absence of abnormal use or reasonable secondary causes the product failed 'to perform in the manner reasonably to be expected in light of [its] nature and intended function.'" *Id.* at 452 (quoting 51 A.L.R.3d 8, § 5[a]).

Bielskis comes close to establishing a prima facie case: certainly a scaffold could be expected not to break and collapse under the weight of a single individual working on it. But unlike the plaintiff in *Tweedy*, Bielskis has failed to prove that the scaffold was defective at the time it left Louisville Ladder's control. He has also failed to exclude the possibility of "abnormal use or reasonable secondary causes." The mini-scaffold was already assembled when Bielskis's employer at the time, R.G. Construction, gave it to him in 1997. Bielskis has not presented any evidence about who assembled the scaffold and whether it was assembled in conformity with the manufacturer's warnings or specifications. Even Mizen's testimony, had it not been barred, did not point to a defect extant at the time the scaffold left the manufacturer. He stated at his deposition that the failed caster did not have a design or manufacturing defect but rather "an installation defect" that occurred because the caster stem was installed with "excessive stress at the moment of installation." But he had neither reviewed the scaffold assembly instructions nor ascertained who had assembled the scaffold. When asked who "installed the casters into the leg tube inserts," Mizen stated that he did not know. When asked if he had any speculation, Mizen replied, "I speculate that the manufacturer did not. They shipped the scaffold without the casters installed. I was told that. But I don't know."

Unlike the failed brakes in *Tweedy*, which were encased in the wheel mechanism, the caster stem was exposed and subject to wear and tear for the seven-year period

that Bielskis owned it. The plaintiff in *Tweedy* had purchased his car as a new automobile just four months before the brakes failed. *Tweedy*, 357 N.E.2d at 450. The plaintiff also traced the history of the brakes, which had been inspected prior to delivery to the plaintiff, to support the jury's conclusion that the brakes were defective when they left the manufacturer. *Id.* at 451-52. Bielskis's case is much more like the situation in *Livingston Service Co. v. Big Wheels, Inc.*, 421 N.E.2d 1042 (Ill. App. 1981). The plaintiff in *Livingston* sued after his custom fertilizer spreader vehicle caught fire while he was using it. *Id.* at 1043. In rejecting the plaintiff's attempt to rely on *Tweedy*, the court in *Livingston* pointed out that the plaintiff had owned the spreader for sixteen months and that the cable that likely caused the fire had been exposed during that time. *Id.* at 1044-45. Bielskis's case is even weaker: he had owned the scaffold for seven years at the time of the accident, and has advanced no particular evidence about its condition when it was received from the manufacturer. Thus, Bielskis has not marshaled sufficient evidence that the mini-scaffold was defective at the time it left Louisville Ladder's control. Without evidence that the mini-scaffold was defective at the outset or that it was free in the 7-year interim period from any abnormal use, Bielskis needs more than the failure of the caster stem to prove his case. *Livingston*, 421 N.E.2d at 1045. And with no expert testimony, he lacks evidence to support his product liability allegations of strict liability and negligence. Summary judgment for Louisville Ladder was therefore proper.

### III.

For the foregoing reasons, we AFFIRM the judgment of the district court excluding Bielskis's expert testimony and granting summary judgment in favor of the defendant Louisville Ladder.